IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ACE CAPITAL LIMITED, a Corporate Capital Provider subscribing to Policy No. ME10147, issued at Lloyd's, London,<br>　　　　　Plaintiff,<br><br>　　　vs.<br><br>MORGAN WALDON INSURANCE MANAGEMENT, LLC, et al.,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 11-128 |

## MEMORANDUM OPINION

Plaintiff, ACE Capital Limited, a Corporate Capital Provider at Lloyd's, London, subscribing to Policy No. ME10147 ("ACE"), brings this action seeking a declaratory judgment that it owes no duty to provide a defense or indemnification with respect to two lawsuits that have been filed against the Defendants in federal courts in Ohio. The Defendants are Morgan Waldron Insurance Management, LLC ("MWIM"), Beverly Morgan, James Waldron, American Workers Master Benefit Plan, Inc. (the "Plan Sponsor"), American Workers Master Benefit Trust-UWUA Local 270 (the "Trust"), American Workers Master Benefit Plan for Employees of FirstEnergy Corporation represented by Local 270 of UWUA (the "Local 270 Plan"), PNC Investments, LLC ("PNC Investments") and the PNC Financial Services Group, Inc. ("PNC Financial"). ACE notes that it has provided a defense to Defendants in those actions pursuant to a reservation of rights.

Currently pending before the Court for disposition are cross-motions for summary judgment. For the reasons that follow, Plaintiff's motion will be granted and Defendants' motion will be denied. Because Plaintiff is not required to provide a defense to Defendants in the underlying suits, it also owes them no duty of indemnification. Therefore, judgment will be

entered in Plaintiff's favor and against Defendants.

Facts

MWIM is an insurance agency that establishes and administers employee health benefit plans. (Policy Application at TPA Supplement.)[1] Beverly Morgan is the President and one of the founding members of MWIM, and James Waldron is the Chief Executive Officer and another of the founding members of MWIM. (Am. Compl. ¶¶ 3-4; Answer ¶¶ 3-4.)[2] MWIM contracted with several unions, including UWUA Local 270 and IBEW Local 245, whose membership consists of workers at FirstEnergy in Ohio, to solicit, negotiate, establish and administer certain union members' employee health benefit plans, which included medical, surgical, prescription drug, and hospital benefits. (ECF No. 34 Ex. 4 at 4-5.)

In 2010, MWIM sought to procure Insurance Professionals Errors and Omissions ("E&O") coverage from an agent of Lloyd's of London. (Am. Compl. ¶ 48; Answer ¶ 48; Policy Application at TPA Supplement.) The Policy Application identifies Defendants MWIM, Morgan and Waldron, but contains no mention of the Plan Sponsor, the Trust, the Plan or the PNC entities.

MWIM completed an application for coverage and submitted it on March 2, 2010. (Am. Compl. ¶¶ 48, 50, 51 & Ex. K.) Policy No. ME10147 (the "Policy") was issued to MWIM as the Named Insured with an effective date of March 10, 2010. (Am. Compl. ¶¶ 34, 35; Answer ¶¶ 34, 35; Policy at Declarations Page.[3]) ACE is a lead corporate capital provider and an underwriter of Policy No. ME10147, issued by Lloyd's, London, which conducts the business of underwriting

---

[1] ECF No. 34 Ex. 3 at 7.
[2] ECF Nos. 25, 27.
[3] ECF No. 34 Ex. 6.

insurance policies out of offices located in London, England.  It has standing to bring this suit as the lead corporate capital provider and underwriter of the Policy.  (Am. Compl. ¶ 2; Answer ¶ 2.)

The Policy provides professional liability insurance for claims arising out of any "Wrongful Act of the Insured in the performance of or failure to perform Professional Services." Coverage extends to MWIM as the "Named Insured" and to other persons or entities which meet its definition of "Insureds" on a claims-made-and-reported basis during an initial policy period of March 10, 2010 through March 10, 2011, and a retroactive date of March 10, 2006, and during extensions through March 26, 2012. (Am. Compl. ¶¶ 34-35; Policy §§ I.1.A, III.).

The Policy defines "Insureds," in relevant part, as

1. The Named Insured designated in Item 1. of the Declarations or by endorsement to this Policy;

2. Any person who is, was or hereinafter becomes a partner, principal, officer, director, or member of the Named Insured, but solely with respect to Professional Services rendered on behalf of the Named Insured;

3. Any Subsidiary which meets the following condition[:]

If during the Policy Period the Named Insured acquires or creates a Subsidiary, other than a joint venture, the Subsidiary shall be considered an Insured under this Policy but only for Wrongful Acts and Employment Practices Wrongful Acts committed after the date of acquisition or creation. The Named Insured shall give written notice to us of its acquisition or creation of the Subsidiary as soon as practicable but in no event more than sixty (60) days after the effective date of such acquisition or creation, together with such information that we may require. Upon receipt of such notice, we may at our sole option agree to appropriately endorse this Policy subject to any additional premium and/or changed terms and conditions. If the Named Insured fails to provide such notice and/or requested information to us, coverage otherwise afforded under this provision to such newly acquired or created Subsidiary shall terminate sixty (60) days after the effective date of such acquisition or creation.

(Am. Compl. ¶ 38; Answer ¶ 38; Policy §§ III.A.1, A.2, A.3.)  The Policy further defines "Subsidiary" as "any entity in which the Insured owns either directly or indirectly 50% or more

of the outstanding voting stock." (Policy § VII.M)

The Policy states that:

We will not defend any Claim or pay any Damages or Claim Expenses based upon, arising out of, directly or indirectly relating to or in any way involving:

1. A dispute concerning the payment of fees, commissions or other remuneration to an Insured.

\*\*\*

3. Insolvency, bankruptcy, liquidation, receivership, rehabilitation or financial inability of the following, including but not limited to the failure, inability or unwillingness to pay Claims, losses or benefits due to the insolvency, liquidation or bankruptcy of:

     a. Any insurance company; or

     b. Any reinsurer; or

     c. Employee benefit plan; or

     d. Any self-insured program; or

     e. Any trust; or

     f. Any risk retention group; or

     g. Any risk purchasing group.

\*\*\*

8. Theft, conversion, misappropriation, commingling, embezzlement, or defalcation of funds or other property.

9. Gaining in fact of any personal profit or advantage to which the Insured is not legally entitled.

\*\*\*

14. Any liability the Insured assumes under any contract or agreement or the breach of any contract, warranty, guarantee or promise unless such liability would have been attached to the Insured even in the absence of such contract, agreement,

warranty, guarantee or promise.

(Am. Compl. ¶ 43; Answer ¶ 43; Policy §§ II.A.1, A.3, A.8, A.9, A.14.)

The Policy sets the parameters for recoverable Damages as follows:

Damages means any amount that the Insured shall be legally required to pay because of judgments rendered against the Insured, or for settlements negotiated with our written consent. Damages will include the five percent (5%) civil penalties imposed on an Insured as a fiduciary under Section 502(i) of the Employee Retirement Income Security Act of 1974 (more commonly referred to as "ERISA") or its amendments for violations of section 406 of the Act, or the twenty percent (20%) penalty imposed on an Insured as a fiduciary under Section 502(i) of ERISA as amended, but only if the violations are the result of a Wrongful Act as defined in the Policy and committed solely in the conduct of Professional Services as stated on the Declarations Page and in the Policy.

(Am. Compl. ¶ 42; Answer ¶ 42; Policy § VII.E, via Endorsement dated 1/08.)

The Policy specifically provides that "Damages do not include" various forms of

remuneration, including, in relevant part:

a. Restitution, sanctions, taxes or multiplied damages;

\*\*\*

d. Monies paid to the Insured as fees or expenses for Professional Services rendered which are to be reimbursed or discharged as part of a judgment or settlement;

\*\*\*

g. Medical benefits, whether in the form of direct payments of medical costs or payment of insurance premiums to maintain medical coverage, or contributions to any medical insurance of any type.

\*\*\*

i. Any other damages, awards, payments of sums which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

(Am. Compl. ¶ 42; Answer ¶ 42; Policy § VII.E, via Endorsement dated 1/08.)

Section II.B. 5 of the Policy provides that the insurer "will not defend any Claim

or pay any Damages or Claim Expenses based upon, arising out of, directly or indirectly relating to or in any way involving … [a]ny suit or action seeking non-pecuniary relief or any suit or action seeking relief or redress in any form other than money Damages." (Am. Compl. ¶ 42; Answer ¶ 42; Policy § II.B.5.)

The Policy has limits of $1,000,000 per Claim and a $3,000,000 General Aggregate Limit with a deductible of $10,000 for each Claim. (Am. Compl. ¶ 36; Answer ¶ 36; Policy at Declarations Page.)  The Policy defines a "claim" as "an oral or written demand received by the Insured for money…."  (Am. Compl. ¶ 40; Answer ¶ 40; Policy § VII.B.)

The Policy defines "Professional Services," in relevant part, as follows:

Professional Services means the marketing, sale or servicing of insurance products, provided they are performed as part of and in conjunction with services the Insured performs for others in their capacity as a licensed agent or broker, general agent, managing general agent or underwriter, program administrator, including a wholesale broker or excess and surplus lines broker for property/casualty, life/health and surety products. Professional Services also includes:

1. Insurance consulting;

***

3. Employee benefits counseling;

***

9. All other operations as designated in Item 7. of the Declarations Page.

(Am. Compl. ¶ 39; Answer ¶ 39; Policy § VII.K.)  Item 7 of the Declarations Page of the Policy specifies that the Professional Services rendered by MWIM are "Insurance Agent/Broker" and "Third Party Administrator." (Am. Compl. ¶ 39; Answer ¶ 39; Policy at Declarations Page.)

The Policy defines a "Wrongful Act" as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission." (Am. Compl. ¶ 40; Answer ¶ 40; Policy

§ VII.N.)  Furthermore, the Policy states that:

> The Limit of Liability shown in Item 3a in the Declarations for each Claim is the most we will pay for all Damages and Claim Expenses incurred in connection with any Claim covered under Insuring Agreement A of this Policy regardless of the number of:
>
> 1. Insureds;
>
> 2. Claims made;
>
> 3. Persons or organizations making Claims.
>
> Claims which are covered under this Policy based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related Wrongful Act, facts, circumstances, situations, transactions, or events, whether related logically, causally, or in any other way, in any combination, shall constitute one Claim, and are limited to a total of one each Claim limit as provided under this Policy.
>
> The Limit of Liability shown in Item 3b in the Declarations as the Policy Aggregate is the most we will pay for the sum of all Damages and Claims Expenses covered under Insuring Agreement A of this Policy.

(Am. Compl. ¶ 41; Answer ¶ 41; Policy §§ IV.A, IV.B.)

<u>The Meznarich Lawsuit</u>

On November 5, 2010, Frank J. Meznarich, Sr., Patrick Shutic and Cale B. Pearson (the "Meznarich Plaintiffs") on behalf of a class of similarly-situated plaintiffs, brought suit against defendants MWIM, Morgan, Waldron, the Plan Sponsor, the Trust and the Local 270 Plan in the United States District Court for the Northern District of Ohio, Eastern Division (the "Meznarich Lawsuit"). (Meznarich Compl. ¶¶ 1, 11-16.)[4]  The Meznarich Plaintiffs amended their complaint on December 28, 2010, to add PNC Investments and PNC Financial as defendants pursuant to Fed.R.Civ.P. 19(a). (<u>Id.</u> ¶ 17.)  No causes of action were alleged as against PNC Investments and

---

[4] ECF No. 34 Ex. 5.

PNC Financial, who were, as set forth by the Meznarich Plaintiffs' counsel in a supplemental filing, named solely due to their status as, respectively, the purported institutional trustee of the Trust and the purported parent company of the purported trustee. (Meznarich Pls.' Mot. to Attach Exs. 1-10.)[5]

The Meznarich Plaintiffs are all alleged to be current Utility Workers of America, Local 270 ("Local 270") members and retirees who had rights to health insurance benefits for themselves and their families pursuant to a collective bargaining agreement between Local 270 and their employer, FirstEnergy. (Meznarich Compl. ¶¶ 8-10, 18.)

The Meznarich Complaint alleges that Local 270 contracted with MWIM, through its principals, Morgan and Waldron, to assist it with obtaining fully-insured individual and dependent coverage for current and retired Local 270 members and their dependents. (Id. ¶¶ 29-38.) The Meznarich Complaint further alleges that the Local 270 Plan was structured so that American Workers Master Benefit Plan, Inc. was the Plan Sponsor and MWIM was the Plan Administrator. (Id. ¶¶ 11, 14.)

The Meznarich Complaint also alleges that Morgan and MWIM instead wrongfully established the requested Local 270 Plan as a self-insured Local 270 Plan with a Voluntary Employee Benefit ("VEBA") Trust, contrary to the directions from the Local 270, and further used a third-party administrator, UMR, to handle health insurance claims rather than a health insurer. (Id. ¶¶ 39-48.) The Meznarich Complaint further alleges that as a result, FirstEnergy sent all health benefit contributions to the Trust, rather than directly to a health insurer. In particular, the Meznarich Complaint states that "[o]n or around February 24, 2010,

---

[5] ECF No. 34 Ex. 7.

representatives of Local 270 discovered that [FirstEnergy] was transferring the health benefit monies to the Trust that was exclusively controlled by Defendants. Defendants Morgan and MWIM were immediately contacted by Local 270 to provide explanation." (Id. ¶¶ 41, 42.) The Meznarich Complaint further alleges that while Morgan admitted on February 25, 2010 that she had created the Trust and had decided to use an institutional trustee, she did not disclose the fact that the Trust was being used to administer a self-insured benefits program in response to Local 270's queries. (Id. ¶ 43.)

Paragraph 49 of the Meznarich Amended Complaint alleges that:

> At the time of their independent decision to offer specific benefits to the [FirstEnergy] employees and retirees in the Local 270 bargaining unit for a set amount of monthly contributions, Defendants either 1) failed to properly calculate the monthly amount of contributions that would be necessary to pay for the benefits listed on the schedules presented by MWIM, 2) included benefits that were too costly to be covered by the [FirstEnergy] contributions and the levels of employee contributions that MWIM had presented, and/or 3) disregarded the fact that the levels of contributions from [FirstEnergy] and the employees would be inadequate to timely pay claims.

(Meznarich Compl. ¶ 49.)

Based on the foregoing, the Meznarich Complaint sets forth three causes of action against the Meznarich Defendants, for breach of fiduciary duty (id. ¶¶ 70-77), violation of ERISA plan (id. ¶¶ 78-84), and fraud (id. ¶¶ 83 [sic] -87). Count I, for breach of fiduciary duty, is in part based upon Section 404 of ERISA, 29 U.S.C. ¶ 1104. (Id. ¶ 71.) Count III, for fraud, alleges that the Meznarich Defendants acted "willfully, deliberately, intentionally, knowingly and purposely" by making "false and fraudulent representations of material fact" (Id. ¶ 84) and by "conceal[ing] from and fail[ing] to disclose material factual information" (id. ¶ 85) to the Meznarich Plaintiffs and Local 270.

The Meznarich Complaint seeks damages resulting from the defendants allegedly having

wrongfully caused the Trust to be underfunded, and thus having caused certain health benefit claims, such as those of the Meznarich Plaintiffs, to go unpaid. (Id. ¶¶ 62-63.) The Meznarich Complaint further seeks damages based on allegations that, inter alia, defendants improperly commingled and diverted trust assets, procured an inadequate stop-loss insurance policy, improperly paid themselves certain administrative fees, and otherwise were unjustly enriched by their wrongful acts. (Id. ¶¶ 49-53, 65-67, 69, 74, 76.)

The Meznarich Complaint requests various forms of relief, including a declaratory judgment that the defendants were obligated to provide health benefits to the class as set forth in their proposals and plan documents; restitution, including payment of all claims; an accounting; disgorgement of any administrative fees, commissions, or other income; compensatory damages; punitive damages; and attorneys' fees and costs. (Id. at 22.)

The Schwind Lawsuit

On March 29, 2011, David J. Schwind, Eugene Rothman, Michael Garcia and Shawn F. Meckfessel (the "Schwind Plaintiffs") brought suit against defendants MWIM, Morgan, Waldron, and the Plan Sponsor in the United States District Court for the Northern District of Ohio, Western Division (the "Schwind Lawsuit"). (Schwind Compl. ¶¶ 3-8.)[6] The Schwind Plaintiffs are all alleged to be current participants in American Workers Master Benefit Plan for Employees of FirstEnergy Corporation Represented by IBEW Local 245 (the "Local 245 Plan"), an employee welfare benefit plan established pursuant to ERISA, 29 U.S.C. § 1002(1), in order to provide health benefits to employees of FirstEnergy Corporation represented by IBEW Local 245. (Id. ¶¶ 3, 10, 12.) Like the Local 270 Plan, the Local 245 Plan was created, maintained and

---

[6] ECF No. 34 Ex. 8.

operated out of the offices of MWIM, in the Commonwealth of Pennsylvania, effective January 1, 2009. (Id. ¶¶ 10, 12.)

The Schwind Lawsuit alleges that Local 245 contracted with MWIM, through its principals, Morgan and Waldron, to assist it with obtaining self-insured individual and dependent coverage for Union members and their dependents. (Id. ¶¶ 12-21.) The Schwind Lawsuit alleges that American Workers Master Benefit Plan, Inc. was identified as the "Plan Sponsor" and MWIM was identified as the "Plan Administrator" on the Local 245 Health Plan 2009 Summary Plan Description. (Id. ¶ 14.) The Schwind Lawsuit also alleges that the Plan Sponsor further established a VEBA Trust to receive health insurance contributions from FirstEnergy. (Id. ¶¶ 22-25.)

The Schwind Lawsuit alleges that the Plan incurred administrative expenses to MWIM, among others, in amounts of more than $100,000 per month. (Id. ¶ 28.) The Schwind Lawsuit further alleges that MWIM retained a third-party administrator, UMR, to manage claims. (Id. ¶ 24.) The Schwind Lawsuit also alleges that Morgan stated that she had diverted funds from one plan to another. (Id. ¶ 43.) The Schwind Lawsuit further alleges that the Schwind Defendants either failed to properly calculate the correct amount of contributions required in order to fully fund the Plan, included benefits in the Local 245 Plan that were too costly for the coverage levels recommended and/or simply disregarded the fact that the FirstEnergy contributions would be insufficient to satisfy the claims. (Id. ¶¶ 26, 102, 103, 125, 126.)

Based on the foregoing, the Schwind Complaint sets forth four causes of action against the Schwind Defendants, all brought pursuant to ERISA: Count I (Demand for Appropriate Equitable Relief Due to Breach of Fiduciary Duty pursuant to 29 U.S.C. § 1132(a)(3)) (Id. ¶¶ 95-108); Count II (Demand for Injunctive Relief Due to Breach of Fiduciary Duty pursuant to 29

U.S.C. § 1132(a)(3)) (id. ¶¶ 109-118); Count III (Demand for Monetary, Equitable, and Remedial Relief to the Plan Due to Breach of Fiduciary Duty pursuant to 29 U.S.C. § 1132(a)(2)) (id. ¶¶ 119-132); and Count IV (Demand for Injunctive Relief to the Plan Due to Breach of Fiduciary Duty pursuant to 29 U.S.C. § 1132(a)(2)) (id. ¶¶ 133-140). These counts generally allege that the Schwind Defendants have breached their fiduciary duties by failing to properly administer the Local 245 Plan, causing it to become underfunded, resulting in the non-payment of claims; that they have failed to remedy the problems of underfunding; and thus, that they caused damage to the Local 245 Plan participants. (Id. ¶¶ 95-140.)

The Schwind Lawsuit seeks injunctive relief including removal of the Schwind Defendants as fiduciaries of the Local 245 Plan, an order appointing an independent fiduciary to manage the Local 245 Plan; along with disgorgement of any profits paid to the Schwind Defendants; the return of losses sustained by the Local 245 Plan; "other relief, legal, equitable or injunctive" in a presently unknown amount; and attorneys' fees and costs. (Id. ¶ 131 & pp. 24-25.)

Other Potential Claims Against Defendants

Counsel for Defendants has also provided notice of a potential claim received from Highmark, a claims administrator for four of the other unions. (Am. Compl. ¶ 33; Answer ¶ 33; ECF No. 34 Ex. 9, 12/30/10 Letter.) Highmark represented that these four additional unions (Local 29, Local 272, Local 459 and Local 180) are underfunded, stating that "the reserve allocable to each participating union local will not be sufficient to cover the anticipated cost of claims run-out," and that they intend to seek relief from Defendants. (Id.)

The ACE Lawsuit

On November 1, 2010, Defendants tendered defense of the Meznarich Lawsuit and

Schwind Lawsuit under the Policy. (ECF No. 34 Ex. 10.)  ACE is defending the Meznarich

Lawsuit and Schwind Lawsuit pursuant to a reservation of rights. (ECF No. 34 Ex. 11.)

Defendants state that the Insurer has not incurred any costs in defending one Defendant in

the Meznarich and/or Schwind Lawsuit which it has not likewise incurred in defending the

agreed-upon insureds, MWIM and its principals.  Plaintiff responds that it has incurred fees in

connection with the preparation and filing of a separate motion to dismiss on behalf of the PNC

defendants.  (ECF No. 43 Ex. A.)

The Meznarich and Schwind Lawsuits remain pending with uncertain outcomes.  The

culpable acts and omissions alleged by the Schwind Lawsuit are alleged to have occurred in

2009 and 2010.  (Schwind Compl. ¶¶ 26, 102, 103, 125, 126.)  Landmark American Insurance

Co. has denied MWIM's tender of the Schwind Lawsuit to Landmark under a subsequently

procured E&O policy, as inapplicable. (Answer ¶¶ 31, 154, Affirmative Defense ¶ 63; see also

Defs.' Resp. Pl.'s First Set Req. Production ¶¶ 16-17.)[7] The Landmark policy only has a

retroactive date to March 26, 2011.

Defendants state that the Meznarich and Schwind Lawsuits arise out of MWIM's separate

dealings with the representatives of two separate locals of two separate unions, in cases filed on

opposite ends of the state of Ohio.  They further state that the allegations in the Meznarich and

Schwind actions involve different representations made by Defendants to those union

representatives, different meetings, different written material exchanges, different

correspondences, and different persons.  Plaintiff responds that both complaints allege that: 1)

Local 270 and Local 245 contracted with MWIM for it to establish and administer a health

---

[7] ECF No. 38 App. F.

benefits plan for their members; 2) MWIM structured the plans to that American Workers Master Benefit Plan, Inc. was the Plan Sponsor and MWIM the Plan Administrator; 3) the plans were funded through contributions from FirstEnergy; 4) the contributions were deposited into a trust set up by the Plan; 5) claims were managed by a third-party administrator called UMR; 6) MWIM erroneously or negligently determined the amount of contributions necessary to fully fund the plan; 7) the plans turned out to be seriously underfunded; 8) the claimants' health claims went unpaid; 9) MWIM either commingled or diverted trust funds; and 10) the plaintiffs were damaged. See ECF No. 43 Exs. G, H.

Defendants state that there have been no other actions filed against MWIM. Plaintiff responds that three additional claim letters from eight other unions alleging that their benefit plans are underfunded have been issued to MWIM, one on behalf of Local 29, Local 272, Local 459 and Local 180 by Highmark, and the others relating to Local 457, Local 140, Local 126 and Local 118 by Anthem and HealthSCOPE. Plaintiff states that MWIM has tendered both claims for defense and indemnity under the Policy and ACE is defending MWIM in connection with those claims pursuant to a reservation of rights. (ECF No. 43 Exs. B, C, D, E.)

The Policy states that it "shall be excess over any other policy or policies … regardless of whether or not the insurance is collectible or recoverable under such policy or policies." (Am. Compl. ¶ 46; Answer ¶ 46; Policy § VI.H.) Defense counsel in the Meznarich Lawsuit prepared and filed a separate motion to dismiss on behalf of Defendants PNC Investments LLC and the PNC Financial Services Group Inc. (ECF No. 43 Ex. A.)

On September 23, 2011, counsel for Defendants in the underlying actions tendered a demand letter from Anthem regarding four more FirstEnergy unions, Local 118, Local 126, Local 140 and Local 457. (ECF No. 43 Ex. B.) The demand letter sought payment for unpaid

medical expenses incurred by members of the medical benefit plans set up and administered by MWIM on behalf of those four unions.  On September 28, 2011, counsel for Defendants tendered a demand letter from another entity, HealthSCOPE, regarding the same four FirstEnergy unions, Local 118, Local 126, Local 140 and Local 457. (ECF No. 43 Ex. C.) HealthSCOPE's demand letter also sought payment for unpaid medical expenses incurred by members of the medical benefit plans set up and administered by MWIM on behalf of those four unions, as well as administrative fees it claimed to be owed pursuant to a third-party administrator agreement.  ACE has agreed to defend MWIM, Morgan, Waldron and American Workers Master Benefit Plan, Inc. in connection with the Anthem and HealthSCOPE demands, pursuant to a reservation of rights. (ECF No. 43 Exs. D, E.)  ACE is also currently defending MWIM, Morgan, Waldron and American Workers Master Benefit Plan, Inc. in connection with a similar demand letter received from an entity called Highmark.  (ECF No. 43 Ex. F.)

Procedural History

On February 1, 2011, a complaint was filed by Certain Underwriters at Lloyd's, London, subscribing to Policy No. ME10147 ("Underwriters").  A First Amended Complaint was filed on April 26, 2011 by ACE (ECF No. 25).  Jurisdiction is based on diversity of citizenship, in that ACE is incorporated under the laws of England and Wales with its principal place of business in London, England; Defendants are American companies and individuals with citizenship of either Pennsylvania (MWIM, Morgan, Waldron, Plan Sponsor, the Trust, the Local 270 Plan, PNC Financial) or Delaware (PNC Investments, PNC Financial); and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.  (Am. Compl. ¶¶ 1-10; Answer ¶¶ 2-10.)

Count I seeks a declaratory judgment that Defendants failed to disclose material risks.

15

Count II seeks a declaratory judgment that Defendants failed to cooperate. Count III seeks a declaratory judgment for damages against all Defendants. Count IV seeks a declaratory judgment against the Plan Sponsor, the Trust, the Local 270 Plan, PNC Investments and PNC Financial. Count V seeks a declaratory judgment against PNC Investments and PNC Financial. Count VI seeks a declaratory judgment that Defendants are not entitled to a defense or indemnity pursuant to Policy Exclusion II.A.1. Count VII invokes Policy Exclusion II.A.2, Count VIII invokes Policy Exclusion II.A.3, Count IX invokes Policy Exclusion II.A.7, Count X invokes Policy Exclusion II.A.8, Count XI invokes Policy Exclusion II.A.9, Count XII invokes Policy Exclusion II.A.14 as to all Defendants and Count XIII invokes it as to PNC Investments and PNC Financial. Count XIV invokes Policy Exclusion II.A.16, and Count XV invokes Policy Exclusion II.A.18, Count XVI invokes Policy Exclusion II.A.19. Count XVII seeks a declaratory judgment that MWIM, Morgan, Waldron and the Plan Sponsor are not entitled to a defense or indemnity because of other insurance. Finally, Count XVIII seeks a declaratory judgment that Defendants are not entitled to a defense or indemnity because of a number of claims.

On September 22, 2011, the parties filed cross-motions for summary judgment (ECF Nos. 32, 35).[8] Responses were filed on October 19, 2011 (ECF Nos. 40, 42) and reply briefs were filed on November 2, 1011 (ECF Nos. 45, 46.)

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine

---

[8] Defendants initially sought summary judgment with respect to all of the claims, but on October 19, 2011, they withdrew the motion with respect to Counts I and II (ECF No. 39).

dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts
sufficient to establish the existence of any element essential to that party's case, and for which
that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986). The moving party bears the initial burden of identifying evidence which demonstrates
the absence of a genuine issue of material fact. Once that burden has been met, the non-moving
party must set forth "specific facts showing that there is a genuine issue for trial" or the factual
record will be taken as presented by the moving party and judgment will be entered as a matter
of law. Matushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue
is genuine only if the evidence is such that a reasonable jury could return a verdict for the
nonmoving party. Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

Plaintiff argues that there are numerous exclusions in the Policy which preclude
Defendants from obtaining defense and indemnity with respect to the Meznarich and Schwind
Lawsuits, specifically: 1) Exclusion II.A.3, which bars claims arising out of a plan's insolvency,
bankruptcy or inability to pay claims (Count VIII); 2) Exclusion II.A.14, which bars claims
where the Insured has assumed the liability under contract (Count XII); 3) Exclusion II.A.1,
which bars claims concerning the payment of fees, commissions or other remuneration to an
Insured (Count VI); 4) Exclusion II.A.9, which bars claims for unjust enrichment (Count XI); 5)
Exclusion II.A.8, which bars claims involving commingling of funds (Count X); and 6)
Exclusion II.A.5, which bars claims seeking non-pecuniary relief (Count III). In the alternative,
Plaintiff argues that: 1) the Policy would limit Defendants' claims to one "Claim" with
corresponding limits of $1,000,000 per claim and $3,000,000 general aggregate limit with a
deductible of $10,000 (Count XVIII); and 2) only MWIM, Morgan and Waldron are "Insureds"

17

under the Policy (Count IV).

Defendants respond generally that ACE is not entitled to summary judgment because potentially covered claims have been asserted against covered Defendants with the same defense interests. They contend that the crux of the Meznarich and Schwind Lawsuits is that the Defendants failed to properly calculate the amount for monthly contributions, included benefits that were too costly and/or disregarded the fact that the levels of contributions from FirstEnergy and the employees would be inadequate, clearly raising the kind of professional negligence allegations the Policy was designed to cover. They argue that the allegations of Count I of the Meznarich Lawsuit (breach of fiduciary duty) and Counts I-IV of the Schwind Lawsuit (various forms of breach of fiduciary duty) state claims that do, would and/or could fall within the Policy because breach of fiduciary duty is essentially a negligence claim with a heightened duty/standard of care. They also note that, regardless of whether all Defendants qualify as "Insureds" under the Policy, there is no question that MWIM and its principals do qualify and that the Insurer has not incurred any additional costs in defending all of the Defendants than it would have incurred in defending the agreed-upon insureds.

In addition, they argue that: 1) in a declaratory judgment action, the court has discretion to defer any decision regarding an insurer's duty to indemnify until the underlying litigation has been concluded and that it would be premature to make such a determination in this case; 2) Exclusion II.A.3 precludes coverage for claims resulting from an insurer's inability to pay a claim due to its insolvency, and if the exclusion is interpreted the way ACE suggests, it would bar the very claims which the E&O policy was procured to cover; 3) ACE argues that its Policy should be deemed excess to a subsequent E&O policy procured by MWIM from Landmark American Insurance Co., but that coverage was denied as inapplicable and in any event the

18

Landmark policy only has a retroactive date of March 26, 2011 which would not cover the acts and omissions alleged by the Schwind Lawsuit (which are alleged to have occurred in 2009 and 2010); and 4) the Meznarich and Schwind Lawsuits arise out of MWIM's separate dealings with the representatives of two separate locals of two separate unions, in cases filed in different courts in Ohio and in any event it would be improper for the Court to make a declaration that speculates upon whether one or several other actions that may be filed will also qualify as a single "Claim" along with these lawsuits.

<u>Duty to Defend and Indemnify</u>

The Court of Appeals for the Third Circuit recently reiterated that:

> It is the function of the court to interpret insurance contracts under Pennsylvania law. <u>Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.</u>, 432 F. Supp. 2d 488, 495 (E.D. Pa. 2006) (citing <u>401 Fourth St., Inc. v. Investors Ins. Grp.</u>, 583 Pa. 445, 879 A.2d 166, 171 (Pa. 2005)) The court's primary consideration in performing this function is "'to ascertain the intent of the parties as manifested by the language of the written instrument.'" <u>Home Ins. Co. v. Law Offices of Jonathan DeYoung</u>, 32 F. Supp. 2d 219, 223 (E.D. Pa. 1998) (quoting <u>Standard Venetian Blind Co. v. Am. Empire Ins. Co.</u>, 503 Pa. 300, 469 A.2d 563, 566 (Pa. 1983)). The policy must be read as a whole and construed in accordance with the plain meaning of terms. <u>C.H. Heist Caribe Corp. v. Am. Home Assurance Co.</u>, 640 F.2d 479, 481 (3d Cir. 1981). Words of common usage must be "construed in their natural, plain, and ordinary sense, with a court free to consult a dictionary to inform its understanding of terms." <u>Melrose Hotel Co.</u>, 423 F. Supp. 2d at 495 (citing <u>Madison Constr. Co. v. Harleysville Mut. Ins. Co.</u>, 557 Pa. 595, 735 A.2d 100, 108 (Pa. 1999)).

> Where the language of an insurance policy is clear and unambiguous, a court must enforce that language. <u>Med. Protective Co. v. Watkins</u>, 198 F.3d 100, 103 (3d Cir. 1999). "Furthermore, if possible, 'a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions.'" <u>Id.</u> (quoting <u>Little v. MGIC Indem. Corp.</u>, 836 F.2d 789, 793 (3d Cir. 1987)). However, if the contract's terms are reasonably susceptible to more than one interpretation, then they must be regarded as ambiguous. <u>Id.</u>; <u>C.H. Heist Caribe Corp.</u>, 640 F.2d at 481. "'Ambiguous provisions in an insurance policy must be construed against the insurer and in favor of the insured; any reasonable interpretation offered by the insured, therefore, must control.'" <u>Med. Protective Co.</u>, 198 F.3d at 104 (quoting <u>McMillan v. State Mut. Life Assurance Co.</u>, 922 F.2d 1073, 1075 (3d Cir. 1990)).

Pennsylvania courts have applied this rule liberally. Id.

American Auto. Ins. Co. v. Murray, 658 F.3d 311, 320-21 (3d Cir. 2011) (footnote omitted).

"The burden is on the insured to establish coverage under an insurance policy....  It is the insurer, however, that bears the burden of establishing the applicability of an exclusion in an insurance contract, and exclusions are always strictly construed against the insurer and in favor of the insured." Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 206-07 (3d Cir. 2001) (citations omitted).  "When an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999).

The Pennsylvania Supreme Court recently reiterated that:

An insurer's duty to defend is broader than its duty to indemnify. It is a distinct obligation, separate and apart from the insurer's duty to provide coverage. Erie Ins. Exch. v. Transamerica Ins. Co., 516 Pa. 574, 533 A.2d 1363 (1987). An insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy. Id. at 1368 (describing the duty to defend as arising "whenever the complaint filed by the injured party may potentially come within the coverage of the policy." (emphasis in original)); Gedeon v. State Farm Mut. Auto. Ins. Co., 410 Pa. 55, 188 A.2d 320 (1963) (same); Cadwallader v. New Amsterdam Cas. Co., 396 Pa. 582, 152 A.2d 484, 488 (1959) ("It is clear that where a claim potentially may become one which is within the scope of the policy, the insurance company's refusal to defend at the outset of the controversy is a decision it makes at its own peril."). As long as the complaint "might or might not" fall within the policy's coverage, the insurance company is obliged to defend. Casper [v. American Guaranty & Liability Ins. Co.], 408 Pa. 426, 184 A.2d 247 [(1962)] (quoting Judge Learned Hand's assertion in Lee v. Aetna Casualty & Surety Company, 178 F.2d 750, 752 (2d Cir. 1949)); Cadwallader, 152 A.2d at 488 (same). Accordingly, it is the potential, rather than the certainty, of a claim falling within the insurance policy that triggers the insurer's duty to defend.

The question of whether a claim against an insured is potentially covered

is answered by comparing the four corners of the insurance contract to the four corners of the complaint. See Donegal Mut. Ins. Co. v. Baumhammers, 595 Pa. 147, 938 A.2d 286, 290 (2007) ("The language of the policy and the allegations of the complaint must be construed together to determine the insurers' obligation."). An insurer may not justifiably refuse to defend a claim against its insured unless it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy. See [General Accident Ins. Co. v.] Allen, 692 A.2d [1089,] 1094 [(1997)] ("[T]he obligation to defend an action brought against the insured is to be determined solely by the allegations of the complaint in the action...."); Gene's Restaurant, Inc. v. Nationwide Ins. Co., 519 Pa. 306, 548 A.2d 246, 246–47 (1988) ("[I]n determining the duty to defend, the complaint claiming damages must be compared to the policy ... the language of the policy and the allegations of the complaint must be construed together to determine the insurer's obligation."); Springfield Tp. et al. v. Indemnity Ins. Co. of North America, 361 Pa. 461, 64 A.2d 761 (1949) ("It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend."). In making this determination, the "factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742 (3d Cir. 1999) (citing Biborosch v. Transamerica Ins. Co., 412 Pa. Super. 505, 603 A.2d 1050, 1052 (1992)). Indeed, the duty to defend is not limited to meritorious actions; it even extends to actions that are "groundless, false, or fraudulent" as long as there exists the possibility that the allegations implicate coverage. Transamerica, 533 A.2d at 1368; Gedeon, 188 A.2d at 321.

American and Foreign Ins. Co. v. Jerry's Sports Center, Inc., 2 A.3d 526, 540-41 (Pa. 2010) (some citations omitted). The court specifically held that if "the insurer is uncertain about coverage, then it should provide a defense and seek declaratory judgment about coverage." Id. at 542. Thus, to the extent that Defendants contend that ACE has acted prematurely by filing this suit seeking a declaratory judgment regarding its duty to defend, that argument is rejected.

However, the Pennsylvania Supreme Court has also held that, "because the duty to defend is broader, a finding that it is not present will also preclude a duty to indemnify." Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 896 n.7 (Pa. 2006) (citation omitted). On the other hand, "a court entertaining a declaratory judgment action in an insurance coverage case should refrain from determining the insurer's duty

21

to indemnify until the insured is found liable for damages in the underlying action." <u>Cincinnati Ins. Cos. v. Pestco, Inc.</u>, 374 F. Supp. 2d 451, 465 (W.D. Pa. 2004) (citations omitted).  Thus, if the Court determines that ACE has a duty to defend, the issue of indemnification will be deferred until a later time, after the underlying actions have been resolved.  But if ACE does not have a duty to defend, then it owes no duty to indemnify, summary judgment should be entered in Plaintiff's favor and the case is at an end.

In this case, ACE was presented with the Meznarich Complaint and Schwind Complaint, which allege, inter alia, that the Defendants either failed to properly calculate the amount of benefits that would be necessary to pay for the benefits listed on the schedules presented by MWIM, included benefits that were too costly to be delivered by the FirstEnergy contributions and the levels of employee contributions that MWIM had presented, and/or disregarded the fact that the levels of contributions from FirstEnergy would be inadequate to timely pay claims.  As Defendants indicate, at least some of the claims asserted in these two cases potentially fall within the coverage provision of Section I of the Policy.  Defendants have met their initial burden of demonstrating potential coverage.

The burden shifts to Plaintiff to demonstrate that a Policy exclusion applies to preclude coverage.  As noted above, Plaintiff focuses on six exclusions.  However, the Court need only address the first exclusion cited, as it is dispositive.

<u>Insolvency Exclusion</u>

ACE moves for summary judgment with respect to Policy exclusion II.A.3, which denies coverage in the event that a claim arises out of insolvency, bankruptcy or financial inability or unwillingness to pay claims, losses or benefits.  ACE argues that the Meznarich and Schwind Lawsuits are premised on the circumstance that the self-insured programs and/or employee

22

benefits plans set up by MWIM to pay the plan members' benefit claims, which were funded through trusts that received benefit contributions from FirstEnergy, were unable to satisfy those claims because the plans were insufficiently funded. Therefore, they argue that, regardless of whether it is the plan itself (whether as an employee benefit plan or in its capacity as a self-insured program) or the trust that is or are alleged to be "insolvent," exclusion II.A.3 applies to preclude coverage.

Defendants respond that the exclusion is ambiguous, that if applied as ACE contends it would defeat the reasonable expectations of the insured and that it would render the Policy illusory. ACE replies that the exclusion is not ambiguous, that the doctrine of "reasonable expectations of the insured" does not apply when the policy language is unambiguous and when the insured is a sophisticated business entity and that the Policy would not be rendered illusory because they are situations that fall within the Policy but do not involve insolvency.

In Smith v. Continental Casualty Co., 2008 WL 4462120 (M.D. Pa. Sept. 30, 2008), aff'd mem., 347 Fed. Appx. 812 (3d Cir. Oct. 8, 2009), Stacey and Marjorie Smith engaged James Sprecher, a financial planner, to handle their investments for retirement. They alleged that they told Sprecher they were long-term investors who wanted a safe investment that would not be withdrawn until retirement and that they had certificates of deposit for retirement investment. Sprecher recommended that they invest in an offshore asset production trust managed by his friends in which the money would be placed in AAA-rated government insured bonds with a guaranteed 10% annual return, and Sprecher stated that their investment would be absolutely safe. Sprecher invested the Smiths' money in two offshore companies which later merged into Evergreen Securities, but none of the securities were registered and Evergreen filed for bankruptcy. Later investigation revealed that the Smiths' money was never put into bonds, but

23

rather was invested in highly speculative mortgage derivatives through Evergreen in a trust that was later described as a Ponzi scheme.

After the Smiths lost their retirement fund, they sued Sprecher for breach of contract, negligent misrepresentation, intentional misrepresentation, violation of Pennsylvania's consumer protection law, breach of fiduciary duty and violation of the Pennsylvania Securities Act. Sprecher settled with the Smiths and assigned them his rights to coverage against Continental, with whom he had a claims-made E&O policy. Continental denied coverage and the Smiths brought suit. Continental moved for summary judgment as to its duty to defend.

The court first concluded that the claims did not fall within the coverage of the policy because Sprecher was not rendering "professional services" as defined by the policy, in that the Evergreen securities were not registered with the SEC or sold through a broker/dealer registered with the NASD, as they had to be in order to qualify as professional services under the policy's definition. Nor could Sprecher's services constitute "Investment Advisory Services" as defined under the policy because the Evergreen securities were not approved by HTK, a broker/dealer for which Sprecher was an agent.

In addition, the court held that, even if the Smiths' claims fell within the scope of the Continental policy, they would not be covered because of two exclusions, one barring claims not involving a broker/dealer named in the declarations and the other barring claims "arising out of insolvency, receivership, bankruptcy or inability to pay of any organization in which the Insured has, directly or indirectly, placed or obtained coverage or in which an Insured has, directly or indirectly, placed the funds of a client or account." With respect to the insolvency exclusion, the court stated as follows:

No Pennsylvania court appears to have construed a similar insolvency exclusion

in an errors and omissions policy. However, most cases in other jurisdictions construing such an exclusion have found it to bar coverage for claims comparable to those raised by the Smiths. <u>See, e.g.</u>, <u>Coregis Ins. Co. v. Am. Health Found., Inc.</u>, 241 F.3d 123, 130–31 (2d Cir. 2001) (collecting cases); <u>Employers Ins. of Wausau v. Tri World Ins. Agency, Inc.</u>, 134 F.3d 377, 1998 WL 23677, at *3 (9th Cir.1998) (unpublished) (collecting cases).[FN11]

> FN11. Some of these cases involve a more broadly worded version of the exclusion which excludes claims "arising out of, based upon or related to" insolvency, <u>see, e.g.</u>, <u>Coregis Ins.</u>, 241 F.3d at 126, rather than the version in the Continental policy which excludes only claims "arising out of" insolvency. Pennsylvania courts, however, have broadly construed the phrase "arising out of" in similar policy exclusions. <u>See</u> <u>McCabe v. Old Republic Ins. Co.</u>, 425 Pa. 221, 228 A.2d 901, 903 (Pa. 1967) (holding that phrase "arising out of" in policy exclusion was unambiguous and "means causally connected with, not proximately caused by. 'But for' causation, i.e., a cause and result relationship, is enough to satisfy this provision of the policy"); <u>Forum Ins. Co. v. Allied Sec., Inc.</u>, 866 F.2d 80, 82 (3d Cir. 1989) (recognizing <u>McCabe</u> as governing Pennsylvania law).

<u>Id.</u> at *11.

The court observed that, while most courts have interpreted this insolvency exclusion in the context of suits against insurance brokers who obtain coverage for a client with a subsequently failed insurance company that is unable to pay the client's claims, the Seventh Circuit extended the reasoning of these decisions to claims against an investment advisor in <u>Transamerica Insurance Co. v. South</u>, 975 F.2d 321, 328–32 (7th Cir. 1992). In that case, Ronald South, an investment advisor, purchased an E&O policy from Transamerica which contained a clause excluding coverage for "any claim arising out of insolvency, receivership or bankruptcy of any organization (directly or indirectly) in which the Insured has placed or obtained coverage or in which an Insured has placed the funds of a client or account." South recommended to several clients the purchase of annuity contracts issued by First Columbia Life Insurance Company, allegedly telling his clients that the annuities were guaranteed and risk-free. If First Columbia had been authorized to do business in Illinois, the Illinois Insurance Guarantee

Fund would have guaranteed the investments.  However, South failed to check with the Illinois

Department of Insurance before recommending the annuities, and did not learn that First

Columbia was not authorized to do business in Illinois and was in poor financial condition.

Eventually, First Columbia was declared insolvent, and South's clients filed suit to recover their

lost investments, alleging that South was negligent in failing to investigate the investments and

misrepresented their safety.  South tendered the claims to Transamerica which filed a declaratory

judgment action seeking a declaration that it had no duty to defend or indemnify South.  The

Seventh Circuit held it was "clear and free from doubt that the claims do fall within the

exclusion." Id. at 328. The court explained that the claims "arose out of" the insolvency of the

organization in which the insured had placed client funds because "[h]ad First Columbia been

solvent, the fact that it was not authorized to transact business in Illinois would have been of no

import." Id.   The court rejected South's argument that the term "arising out of" was ambiguous,

holding that when modified by the phrase "directly or indirectly," the exclusion unambiguously

excluded coverage for claims that directly or indirectly arise out of the insolvency of any

organization in which an insured places the funds of a client.  Id. at 329.

The court in Smith concluded that:

> The facts of this case are quite analogous to those presented in South. The Smiths allege that Sprecher misrepresented the safety of the Evergreen funds and negligently recommended that they invest in such securities. Evergreen declared bankruptcy, and the Smiths lost their investments. While the Smiths asserted several different theories of recovery against Sprecher, each of their claims is premised on the fact that Sprecher, directly or indirectly, placed their funds in Evergreen, which then went bankrupt and was unable to pay any return on their investment. See Mut. Benefit Ins. Co. v. Haver, 555 Pa. 534, 725 A.2d 743, 745 (Pa. 1999) (stating "the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered. Instead it is necessary to look at the factual allegations contained in the complaint"). The Smiths' claims thus "arise out of" Evergreen's bankruptcy and inability to pay; were it not for these circumstances, the Smiths would not have filed suit against Sprecher. See

> McCabe, 228 A.2d at 903 (holding that phrase "arising out of" in policy exclusion requires only "but for" causation). In the absence of controlling Pennsylvania authority on this issue, the Court will follow the reasoning of the Seventh Circuit's decision in South and hold that Exclusion 14 of the Continental policy bars coverage for the Smiths' claims.

Id. at *12.

Defendants argue that this situation is distinguishable from the ones addressed by courts in Coregis, Smith and South because here, MWIM did not place coverage with a health plan that defaulted on payments sought by MWIM's clients. Rather, MWIM set up self-insured benefits plans and trusts and the source of the liability would be MWIM's own miscalculation about what sums were needed to sufficiently fund self-insured health benefit plans created by MWIM on behalf of these union memberships. Thus, they contend that the purpose of the insolvency exclusion would not be served by applying it in this case.

This argument encounters two problems: 1) it makes a distinction without a difference; and 2) it looks to the "underlying purpose" of the exclusion to contravene the specific, unambiguous policy language. First, the cases cited by ACE do not rely on the fact that the insolvency was that of a third party, an entity unknown to the insurer. Rather, the exclusion was found to preclude coverage because it "related to" or "arose from" an insolvency. As the court stated in Coregis:

> The term "related to" is typically defined more broadly and is not necessarily tied to the concept of a causal connection. Webster's Dictionary defines "related" simply as "connected by reason of an established or discoverable relation." Webster's Third New International Dictionary, supra, at 1916. The word "relation," in turn, as "used esp[ecially] in the phrase 'in relation to,' " is defined as a "connection" to or a "reference" to. Id. at 1916. Courts have similarly described the term "relating to" as equivalent to the phrases "in connection with" and "associated with," see Jackson v. Lajaunie, 270 So.2d 859, 864 (La.1972), and synonymous with the phrases "with respect to," and "with reference to," see Phoenix Leasing, Inc. v. Sure Broad., Inc., 843 F. Supp. 1379, 1388 (D. Nev. 1994), aff'd, 89 F.3d 846 (9th Cir. 1996), and have held such

27

phrases to be broader in scope than the term "arising out of." See Jackson, 270 So.2d at 864 (" 'In connection with' is a broader term than 'arising out of the use of the premises for the purposes' of a service station.... This [injury] was linked to the station, associated with the station, related to the station, and, in the absence of a new and restrictive definition of an old and well understood word, connected with the station." (internal citations and footnote omitted)); cf. Cameron Mut. Ins. Co. v. Skidmore, 633 S.W.2d 752, 753 (Mo. Ct. App. 1982) ("It appears to us that 'in connection with' [any premises] has a broader meaning than 'arising out of any premises.' ").

241 F.3d at 128-29.

In this case, the Policy exclusion is broadly worded: it precludes coverage for any claim "based upon, arising out of, directly or indirectly relating to or in any way involving" the insolvency, bankruptcy, liquidation, receivership, rehabilitation or financial inability of" a number of entities, including an "employee benefit plan," a "self-insured program" or a "trust." (Policy § II.A.3(c, d, e).)  Defendants cannot and do not dispute that the Meznarich and Schwind Lawsuits allege that the self-insured programs and/or employee benefit plans set up by MWIM to pay the plan members' benefit claims, which were funded through trusts that received benefit contributions from FirstEnergy, were unable to satisfy those claims because the plans were insufficiently funded by MWIM.  Even if the claims cannot be said to "arise from" the plans' insolvencies, it cannot be argued that the claims do not "relate to" these insolvencies, irrespective of the fact that the mistakes made by MWIM occurred prior to the insolvencies.  Second, Defendants cannot rely upon the "underlying purpose" of the Policy exclusion to create an ambiguity where none exists.

The only court to have found a distinction regarding an insolvency exclusion is the Kentucky Supreme Court in St. Paul Fire & Marine Insurance Co. v. Powell-Walton-Milward, Inc., 870 S.W.2d 223 (Ky. 1994).  That court found that an insolvency exclusion would be incompatible with the overall insurance policy, which protected against "wrongful acts" of the

28

insured, if it excluded claims arising out of insolvencies in which the insured had done no wrong. Id. at 226. Thus, the court found the insolvency exclusion to be ambiguous and interpreted it in favor of coverage. However, that decision "has not been followed by any court outside of Kentucky." Associated Community Bancorp, Inc. v. Travelers Cos., Inc., 2010 WL 1416842, at *7 (D. Conn. Apr. 8, 2010), aff'd mem., 421 Fed. Appx. 125 (2d Cir. May 11, 2011). The Associated Bancorp case denied coverage under an insolvency exclusion for an insured that invested clients' funds with Bernie Madoff because "[t]he underlying lawsuits are certainly connected with, incident to, or flow out of Madoff's insolvency. Had Madoff not become insolvent and lost the investors' money, the investors would have had no damage and thus no reason to file suit…"). Id. at *4.

Moreover, the distinction would not help Defendants in this case in any event, as the Meznarich and Schwind Lawsuits explicitly allege that MWIM (the insured) was responsible for the lack of funding of the self-insured programs and/or employee benefit plans. That is, Kentucky law would only find ambiguity if the insolvency arose in a third-party with which MWIM had placed coverage but had done no wrong.

Defendants argue that to apply the exclusion in the manner argued by ACE would defeat the "reasonable expectations of the insured." However, the Court of Appeals has stated that this doctrine:

> is only applied "in very limited circumstances" to protect non-commercial insureds from policy terms not readily apparent and from insurer deception. Madison Construction Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 735 A.2d 100, 109 n. 8 (1999). Absent sufficient justification, however, "an insured may not complain that his or her reasonable expectations were frustrated by policy limitations that are clear and unambiguous." Frain v. Keystone Ins. Co., 433 Pa. Super. 462, 640 A.2d 1352, 1354 (1994).

Liberty Mut. Ins. Co. v. Treesdale, Inc., 418 F.3d 330, 344 (3d Cir. 2005).

29

In Smith, the policy was purchased and held by Penn Mutual Life Insurance Co., a sophisticated entity which clearly had an understanding of insurance contracts. Therefore, the court held that the insured could complain that his reasonable expectations were frustrated by policy limitations which are clear and unambiguous and could not rely on either of the two limited circumstances of the doctrine: to protect a non-commercial insured from policy terms not readily apparent and to protect a non-commercial entity from deception. 2008 WL 4462120, at *10. As in Smith, neither of these circumstances is presented here: the Policy was purchased and held by MWIM, a sophisticated business entity, and Defendants do not even contend that the insolvency limitation was not clear. They do claim that it was ambiguous but, as discussed above, courts have held that this kind of exclusion in a policy is unambiguous. Courts have observed that "the fact that a term is broad in scope does not necessarily make it ambiguous." Coregis, 241 F.3d at 129 (citation omitted).

Finally, Defendants argue that to accept ACE's argument would render the coverage "illusory." ACE responds that it is "easily conceivable" that other types of claims could have been asserted against MWIM that did not involve insolvency, which the Policy could cover.

As noted by a Pennsylvania federal court:

Insurance coverage is considered "illusory" where the insured purchases no effective protection. See Lee R. Russ, 7 Couch on Insurance 3d, § 101:20 at 101–74 (West 1997). An insurance policy is not illusory if it provides coverage for some acts; "it is not illusory simply because of a potentially wide exclusion." Bagley v. Monticello Ins. Co., 430 Mass. 454, 720 N.E.2d 813, 817 (Mass. 1999). "Coverage under an insurance policy is not illusory unless the policy would not pay benefits under any reasonably expected set of circumstances." Lexington Ins. Co. v. Am. Healthcare Providers, 621 N.E.2d 332, 339 (Ind. App. Ct.1993). Contracts are illusory when "one party exploits the other;" where the contracts are "hopelessly or deceptively one-sided." Truck Ins. Exch. v. Ashland Oil, Inc., 951 F.2d 787, 790 (7th Cir. 1992) (Posner, J.).

Titan Indemnity Co. v. Cameron, 2002 WL 1774059, at *18 (E.D. Pa. July 30, 2002), aff'd

mem., 77 Fed. Appx. 91 (3d Cir. Sep. 17, 2003). Defendants have not demonstrated that the Policy would not pay benefits under any reasonably expected set of circumstances. The fact that it does not pay benefits in the case of "insolvency," whether this is a broad exclusion or a situation that ACE could have anticipated, does not mean that it is not conceivable that there are other types of claims that would be covered.

Therefore, Plaintiff has met its burden of demonstrating that Policy exclusion II.A.3 applies and that it does not owe a defense or a duty to indemnify Defendants with respect to the allegations made in the Meznarich and Schwind Lawsuits. Plaintiff's motion for summary judgment will be granted, Defendants' motion will be denied, and the remaining counts of the Amended Complaint will be dismissed as moot.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ACE CAPITAL LIMITED, a Corporate Capital )
Provider subscribing to Policy No. ME10147, )
issued at Lloyd's, London, )
          Plaintiff, )
  )
  vs.   )       Civil Action No. 11-128
  )
MORGAN WALDON INSURANCE )
MANAGEMENT, LLC, et al., )
          Defendants. )

<u>ORDER</u>

AND NOW, this 28th day of November, 2011,

IT IS HEREBY ORDERED that the motion for summary judgment filed by the Plaintiff, ACE Capital Limited, on Counts III, IV, VI, VIII, X, XI, XII and XVIII of the Amended Complaint (ECF No. 32) is granted.

IT IS FURTHER ORDERED that the motion for summary judgment filed by the Defendants, Morgan Waldron Insurance Management, LLC, Beverly Morgan, James Waldron, American Workers Master Benefit Plan, Inc., American Workers Master Benefit Trust-UWUA Local 270, American Workers Master Benefit Plan for Employees of First Energy Corporation represented by Local 270 of UWUA, PNC Investments, LLC and the PNC Financial Services Group, Inc., on Counts III-XVI of the Amended Complaint (ECF No. 35) is denied.

IT IS FURTHER ORDERED that the remaining counts of the Amended Complaint (Counts I, II, V, VII, IX, XIII, XIV, XV, XVI and XVII) are dismissed as moot.

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge